E-FILED
Thursday, 25 April, 2013  04:07:11 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| TIMOTHY ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12-cv-3167 |
| | ) | |
| CAROLYN COLVIN, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Timothy Anderson appeals the denial of his applications for Disability Insurance Benefits and Supplemental Security Income (collectively Disability Benefits) under Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 216(i), 223, 405(g), 1381a, 1382c, and 1383(c). Anderson has filed a Brief in Support of Motion for Summary Judgment (d/e 10) (Anderson Motion), and Defendant Acting Commissioner of Social Security (Commissioner) has filed a Motion for Summary Affirmance (d/e11).[1]  The parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before this Court.  <u>Consent to Proceed Before a United States</u>

---

[1] The Court takes judicial notice that Carolyn Colvin is now Acting Commissioner of Social Security. Colvin is, therefore, automatically substituted in as the Defendant in this case.  Fed. R. Civ. P. 25(d).

Magistrate and Order of Reference, entered October 31, 2012 (d/e 9).  For the reasons set forth below, the Decision of the Commissioner is AFFIRMED.

## STATEMENT OF FACTS

Anderson was born on September 1, 1971.  He completed high school and two years of college, but did not receive a degree.  Answer to Complaint (d/e 6), attached Certified Transcript of Proceedings before the Social Security Administration (R.), at 53-54.  Anderson previously worked in the software industry as a quality assurance tester, engineer, and project supervisor.  R. 139.  He last worked in November 2001.  R. 53, 292.  He alleged that he became disabled on June 1, 2006.  Anderson suffers from major depressive disorder, panic disorder, generalized anxiety disorder, and a history of polysubstance abuse, in remission.  R. 34.

On April 24, 2006, Anderson saw Dr. Timothy Jacobs, D.O., at an ambulatory care facility in Quincy, Illinois, requesting a blood work up to check his cholesterol.  Anderson also reported to Dr. Jacobs that he had suffered from a panic disorder for several years.  R. 232.  Anderson reported that he had tried several medications for panic and depression, but nothing helped.  Dr. Jacobs referred him to Dr. M. Nassery, M.D. R. 229.

On April 25, 2006, Anderson saw Dr. Nassery's nurse practitioner Elizabeth Stumpf, CNP.  R. 229-31.  Anderson reported that he had experienced depression and panic attacks for seven years.  He described the panic attacks as a choking and nausea, accompanied by shakiness and sweating.  R. 229.  Anderson also reported problems with insomnia. Stumpf observed that Anderson was anxious during the examination. R. 230.  Stumpf diagnosed an adjustment disorder with anxiety, prescribed Lexapro, and referred Anderson to Transitions of Western Illinois (Transitions) for evaluation.  R. 230-31.

On May 9, 2006, Anderson saw Stumpf again.  Anderson reported that his insomnia improved and the number of daily panic attacks had decreased.  He still felt irritable and had trouble concentrating.  Anderson denied having feelings of hopelessness, guilt, or helplessness; and denied having homicidal or suicidal thoughts.   Anderson had started seeing a counselor at Transitions, David Edwards, LCPC, and was scheduled to see a psychiatrist in July 2006.  Stumpf continued the Lexapro.  R. 227; see R. 261.

On June 20, 2006, Anderson saw Stumpf again.  Anderson reported seeing counselor Edwards on a weekly basis at Transitions.  Anderson reported fewer panic attacks.  Anderson reported that the Lexapro was only

mildly helping.  Stumpf diagnosed Anderson with generalized anxiety disorder with panic attacks.  R. 225.

On July 31, 2006, Anderson saw a psychiatrist at Transitions, Dr. Salvador Sanchez, M.D., for a psychiatric evaluation.  R. 276. Anderson reported that his depression and anxiety worsened when his mother died two years earlier in California.  Anderson was living in California with his mother at the time of her death.  Anderson thereafter moved from California to live with his grandparents in Plainville, Illinois. Anderson reported "recurrent, frequent, and intense panic attacks occurring daily and all day long."  R. 276.  He reported that he was unable to function due to the panic attacks.  R. 276.  He reported that his symptoms had improved since he started seeing his counselor Edwards.  R. 276.

Anderson reported to Dr. Sanchez that he was withdrawn, isolated, and unable to sleep.  He had poor memory, attention, and concentration, but he noticed improvement with his current treatment.  Anderson reported one hospitalization in the past for a suicide attempt.  Anderson had a history of drug abuse, but reported no current illegal drug use.  Anderson had symptoms of depression and anxiety.  Dr. Sanchez's mental status examination indicated that Anderson was not in acute distress.  Anderson had rapid fluttering of the jaw and some shaking due to anxiety.  Anderson

denied any hallucinations or suicidal or homicidal ideations; however, he

stated that he sometimes had fleeting death wishes.  R. 227-28.

Dr. Sanchez diagnosed major depressive disorder, moderate, recurrent,

without psychotic features; panic disorder without agoraphobia; generalized

anxiety disorder; and history of polysubstance abuse, in remission.  He

gave Anderson a Global Assessment of Functioning (GAF) score of 55.

R. 276-78.  Dr. Sanchez prescribed Zoloft and Clonazepam, and continued

counseling sessions with Edwards.  R. 278.

On September 12, 2006, Anderson saw Stumpf again.  R. 223.

Anderson reported that the medications prescribed by Dr. Sanchez seemed

to be working.  Stumpf recommended that Anderson "get out and exercise

and to consider finding some employment . . . ."  R. 223.

On February 27, 2007, Anderson saw Stumpf again.  Anderson

reported that his grandmother died in January 2007, and he was having

financial problems.  Stumpf assessed "anxiety and depression, coupled

with grief."  R. 221.  Stumpf noted that Anderson's mood was stable.

R. 221.

On January 24, 2008, Anderson saw counselor Edwards at

Transitions.  Anderson reported having low energy.  He was stressed about

his grandfather undergoing surgery.   He was in good compliance with his

medications.  His sleep was improved.  He reported no suicidal or homicidal ideations.  R. 279-80.

On April 24, 2008, Anderson saw Edwards at Transitions.  Anderson reported that his sleep was good and his depression was manageable.  Anderson denied having suicidal or homicidal thoughts, but he reported having auditory hallucinations.  R. 281.

On July 24, 2008, Anderson saw Edwards at Transitions.  Anderson reported that he wanted to go back to school or work.  Edwards noted that Anderson's medications were effective.  R. 284.

On September 18, 2008, Anderson saw Edwards at Transitions.  Edwards noted that Anderson's panic attacks were under control.  Anderson's sleep was good and he again denied any suicidal or homicidal ideations.  R. 287.

On November 25, 2008, Edwards prepared an Adult Mental Health/DD Assessment of Anderson.  Edwards noted that Anderson began receiving treatment at Transitions for anxiety and depression in May 2006.  Anderson's main concern at the beginning was anxiety and panic attacks, but more recently, Anderson's main concern was depression.  R. 262.  Anderson reported that he sometimes heard voices and sounds, such as footsteps or movements.  Anderson reported that the auditory

hallucinations did not "bother" him, but that the hallucinations were "annoying to him at times."  R. 262.  Edwards reported that Anderson made considerable progress in reducing symptoms of depression over the past year.  R. 262.  Anderson continued to make progress to control his symptoms of depression and anxiety.  R. 264.  Anderson's symptoms had been reduced over the past year.  R. 274.  Anderson was taking Zoloft, Trazodone, and Neurontin at the time and was compliant with those medications.  R. 265, 274.

Anderson reported to Edwards that he was interested in television, cars, computers, writing, video games, movies and music.  Anderson reported that he wanted to pursue several goals, including going back to school, working, and leading a more productive life.  R. 270.  Edwards stated that Anderson had problems of self-esteem/efficacy and lack of motivation.  R. 270.

On examination, Edwards observed Anderson's mental status was within normal limits, but Edwards observed that Anderson had a blunted affect and depressed mood.  Anderson's memory was intact and he had good insight.  R. 271.  Edwards diagnosed major depressive disorder, severe, recurrent, with psychotic features and generalized anxiety disorder.  R. 272.  Edwards assessed a Global Assessment of Functioning (GAF)

score of 61.  R. 272.  Edwards stated that Anderson did not meet the criteria for mental health related serious impairment.  R. 272.  Edwards recommended continuing outpatient psychiatric and therapy/counseling services.  Edwards recommended that the primary focus should be on reducing symptoms of depression and monitoring progress with anxiety. R. 274.  Edwards stated that Anderson was more appropriately diagnosed with generalized anxiety disorder rather than panic disorder because of the infrequency of his panic attacks and his more generalized anxious disposition.  R. 274.

On March 19, 2009, Anderson went to see a nurse Amy Anderson, at Transitions for a medication check.  R. 339.  Anderson reported that his sleep was good.  Anderson reported he was anxious all the time and had fleeting suicidal thoughts.  Anderson reported no psychosis.  Anderson reported that the effect of his medications was poor, and he requested an increase in the dosage.  Anderson reported that he argued with his grandfather frequently and had financial and vocational stressors.  R. 339-40.  On March 24, 2009, Dr. Sanchez increased the dosage of Anderson's Zoloft and Neurontin.  R. 340.

On April 17, 2009, Anderson completed a Function Report.  R. 158-65.  Anderson stated that his "day is strongly determined by mood."

R. 158. Anderson stated that he could take care of his personal hygiene and do household chores, although he sometimes neglected dressing and hygiene. He did not need special reminders to take care of his personal needs and grooming. Anderson washed dishes, did household repairs, took out the trash, and cleaned up after his dog. Anderson also cooked his own meals. He reported that he did chores as necessary. He also cared for his dog, including walking the dog. Anderson reported that he lived with his grandfather; was unable to drive a car, attend gatherings, associate with people at length, or relax; and could not pay bills because of the stress it causes. R. 158-61. Anderson stated that he had difficulty dealing with others, including family members. He described his temper as "shot" and his tolerance as "non-existent." R. 163. Anderson said that he could concentrate for an hour at a time. He had no problems following written instructions and, usually could follow spoken instructions without much trouble. He stated that he could get along with authority figures, except, "If the authority figure is a jerk then I won't get along at all." R. 164. Anderson stated that he could handle changes in routine, but did not handle stress well at all. R. 164. Anderson stated that sometimes he could not get out of bed because of his depression. At those times, all he wanted to do was sleep and not have to deal with the world. R. 165.

On April 27, 2009, state agency psychologist Dr. Frank Froman, Ed.D., performed a consultative psychological examination of Anderson. R. 291-95.  Anderson reported that he dropped out of college after two years because of depression that he suffered after his mother died. R. 291.  Anderson reported that he was a patient in a psychiatric unit in 2003 or 2004.  R. 291.  He had a history of drug and alcohol abuse, but no current problems.  R. 292.  Anderson had no current physical problems. R. 291.  Anderson reported that he never tried to commit suicide, but he had suicidal thoughts before.  Dr. Froman observed that Anderson related in a manner that suggested slight anxiety.  Anderson had good ability to relate.  Anderson's speech was "extraordinarily abundant but clear and easy to understand."  R. 292.

Anderson told Dr. Froman that he no longer socialized due to his depression.  He had problems sleeping and indicated he was gaining weight.  Anderson reported that he drank eight to ten cups of coffee a day. Anderson did not relate feeling anxious to his consumption of coffee. Anderson reported that he watched television, got on the computer, and played video games during the day.  Anderson also reported that he was able to perform household chores and care for his personal hygiene. R. 292.

Dr. Froman's mental examination showed that Anderson was properly oriented and in good contact with reality. Anderson had a good memory and was able to perform calculations. Dr. Froman estimated that Anderson's IQ was at least in the average range or better. R. 293. Dr. Froman noted that Anderson's anxiety might be stimulated by caffeine. R. 293. Dr. Froman noted that Anderson stayed by himself and was reluctant to participate in life. Dr. Froman found that Anderson's greatest problem was his depression. Dr. Froman gave Anderson a GAF score of 50. R. 295.

Dr. Froman diagnosed major depressive disorder, panic disorder with agoraphobia, caffeine dependence, generalized anxiety disorder, and a history of polydrug and alcohol abuse, in full remission. R. 293. Dr. Froman stated, "Restarting his life will take significant effort, likely more than he is able to mount, given the episodic nature of the helping process which he is receiving." R. 294. Dr. Froman opined that Anderson could perform simple one and two-step assemblies at a competitive rate; could relate minimally but adequately to coworkers and supervisors; could understand oral and written instructions; could manage his own benefits; and could withstand the stress associated with modest levels of employment. R. 294.

On May 18, 2009, state agency psychologist, Dr. Donald Henson, Ph.D., completed a Psychiatric Review Technique Form (PRTF) and a Mental Residual Functional Capacity Assessment (MRFCA).  R. 296-313. Dr. Henson opined that Anderson had an affective disorder, generalized anxiety disorder, and substance addiction disorder, which resulted in moderate restrictions in activities of daily living and maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace.  R. 300, 310.  Dr. Henson opined that Anderson's mental impairments, "would adversely affect his ability to perform satisfactorily detailed activities of a somewhat complicated nature."  R. 298.  Dr. Henson also opined that Anderson's "adaptive behaviors [were] adequate for vocational involvement."  R. 298.

On June 15, 2009, Anderson went to see Nurse Anderson at Transitions for medication monitoring.  Anderson reported feeling more depressed.  He also felt hopeless and helpless, and overwhelmed to have to do things on his own.  Anderson denied having any suicidal or homicidal ideation.  R. 341-42.

On August 20, 2009, Anderson saw Edwards at Transitions. Anderson reported that his mood was average.  Anderson denied any hopeless or helpless feelings.  R. 344-45.  Anderson's sleep was also

good, and Anderson denied any suicidal or homicidal ideations.  R. 345.

Anderson reported that his mood was not any different and his energy was

low.  R. 344-45.

On November 2, 2009, state agency psychologist Dr. Linda Lanier,

Ph.D., reviewed the record evidence and affirmed Dr. Henson's PRTF and

MRFCA.  R. 387-88.

On February 1, 2010, another Adult Mental Health/DD Assessment

was prepared.  R. 351-67.  The signatures on the form are illegible, but do

not appear to be those of either Edwards or Dr. Sanchez, or the new

counselor that Anderson later saw at Transitions in November 2010, Ty

Carlson.  Anderson appears to have filled out part of the form himself, and

a representative of Transitions appears to have completed parts of the

form.  Anderson reported that he has been able to cope with his panic

attacks, but his depression was causing isolation and socialization

problems.  R. 351.  Anderson reported issues in social adjustment, work,

and self-care/ daily living skills.  R. 352.  He was taking Zoloft, Trazodone,

and Clonazepam.  R. 355.  The mental status examination showed normal

findings except that Anderson had a depressed mood.  R. 362.  Anderson

did not have any delusions, paranoia, or feelings of helplessness or

worthlessness.  Anderson did not report any hallucinations.  Anderson

reported that his biggest barriers were depression and social anxiety.

R. 351.  The Transitions employee completing the form gave Anderson a

GAF score of 55 and noted serious impairments in social group and

employment.  R. 363.

On September 13, 2010, Anderson saw nurse Judy Christner at

Transitions for medication monitoring.  At the time, Anderson was

compliant with his medications and the medications were effective.  R. 372.

Christner stated that Anderson had some anxiety and low energy.

Anderson reported that his sleep was good.  Anderson denied having any

suicidal or homicidal ideations.  Christner recommended that Anderson

exercise fifteen to twenty minutes a day.  R. 373.

On November 17, 2010, Anderson saw counselor Ty Carlson at

Transitions.  R. 376-77.  Carlson noted, "While [Anderson] was able to

report great success with his anxiety attacks, he felt his depression is only

getting worse from living in Illinois."  R. 377.  Anderson reported that he felt

trapped in his current situation.  R. 377.  Carlson and Anderson discussed

Anderson's desire to move out of his grandfather's house.  Carlson noted

that Anderson was depressed and had "lost confidence in the ability to

3:12-cv-03167-BGC   # 13   Page 15 of 34

change." R. 376. Carlson gave Anderson a GAF score of 42 on November 17, 2010. R. 368.

On December 1, 2010, Anderson met with Carlson at Transitions. Anderson "discussed his disdain" for where he lives. R. 378. Carlson suggested pursuing hobbies such as writing. Carlson also suggested "getting out more and engaging other people but [Carlson] stated a lack of people to engage and a difference in personalities." R. 378. Carlson suggested finding tasks in which Anderson's interests overlapped with others in the area. Carlson suggested that Anderson's "interest in botany being put towards a garden." R. 378. Anderson was not interested. Carlson noted that Anderson responded to his suggestions with "'I don't really want to.'" R. 378. Carlson opined, "This lack of willingness to commit is reinforcing an attitude of helplessness." R. 378.

On December 23, 2010, Anderson went to Transitions for medication monitoring. R. 379-81. The form does not identify the staff member with whom he met. Anderson reported poor communication with Transitions staff. He also reported that he went without his medications for two weeks. He reported that he felt depressed. He reported that his appetite was good, his sleep was fair, and his energy was low. He denied any suicidal or homicidal ideations. R. 380.

Page **15** of **34**

On January 19, 2011, the Administrative Law Judge (ALJ) held an evidentiary hearing by video conference.  R. 49-71.  The ALJ presided in Chicago, Illinois.  Anderson and his attorney appeared in Hannibal, Missouri.  A vocational expert, Amy Kutschbach, appeared by telephone. R. 51.

Anderson testified first.  He testified that he last worked in November 2001.  R. 53.  Anderson testified that his panic attacks prevented him from working.  He would have a panic attack at work and would stop whatever he was doing at work.  R. 64.

He first received psychological care in 2003 while he was living in California.  In late 2003, he was hospitalized after it was determined that he was a danger to himself.  R. 55.  Anderson testified that he was currently receiving mental health care from Transitions.  He testified he went to Transitions in July 2006 to treat his panic disorder.  He was suffering from panic attacks "day and night."  R. 55.  He testified that he had about eight attacks a day and each lasted for an hour.   R. 56.  Anderson testified that since he started receiving treatment at Transitions, the frequency of the attacks had gone down.  He testified that after several months he was down to one or two attacks a day.  R. 57.

He testified that at the time of the hearing, he had panic attacks about three times a week, with each attack lasting about thirty minutes.  He testified that panic attacks could be triggered by pain or increased heart rate caused by caffeine or other sources.  R. 59.

Anderson testified that he still felt anxiety even with the reduced panic attacks.  He described his anxiety, "It's a feeling of restlessness, nervousness and includes lack of concentration and physical nausea." R. 57.  He testified that his thoughts "go wild on their own."  He testified that he would be watching television, but stop paying any attention to what he was watching.  R. 58.

Anderson testified that he got nervous in public places.  He testified that he got really nervous if he was around of group of three or more people.  R. 60.

Anderson testified that his depression has not improved at all since he started receiving treatment at Transitions in 2006.  He testified that, "I am feeling hopelessness, listlessness, inability to concentrate.  I sleep too much or not enough."  R. 60.   He said he had good days and bad days with his depression.  He testified that he had bad days "at least 90 percent of the time."  R. 61.  On bad days he testified that he felt "really blue."

R. 61.  He focused on how terrible his life was.  He tended to lie in bed trying to sleep, but being unable to.  R. 61.  He testified that he had thoughts of suicide three or four times a week.  R. 61-62.  Anderson testified that his counselors at Transitions are trying to help him with his depression.  R. 62.

Anderson testified that he had trouble dealing with other people.  He said that he felt he could not give other people what they want.  He testified that his attempts at friendships have failed because the other person did not want to deal with his depression.  R. 63.

Anderson testified that he took Trazadone to help him sleep.  He testified that the medication helped about half of the time.  He testified that about two to three times a week he felt rested when he woke up in the morning.  The rest of the time he woke up during the night with racing thoughts about his life and his situation.  R. 65-66.

The vocational expert Kutschbach then testified.  The ALJ asked Kutschbach,

> So he's 35.  And he has two years of college.  And he's able to perform one and two-step assemblies, able to relate minimally but adequately to coworkers and supervisors and can withstand the stress of moderately stressful work.  Now, can that person do any of those past jobs?

R. 67.  Kutschbach said no.  R. 67.

Kutschbach testified that such a person could perform other jobs, such as laundry worker with 270 to 350 such jobs in the region, 10,000 in the state, and 890,000 in the nation; repack crew worker, with 250 to 300 such jobs in the region, 48,000 in the state, and 470,000 in the nation; and sorter, with 300 to 350 such jobs in the region, 12,000 in the state, and 500,000 in the nation.  R. 68-69.

That ALJ asked Kutschbach to assume for one-third of the workday, the person could not carry out instructions, maintain regular attendance, or interact with the general public.  Kutschbach opined that such a person would be unemployable.  R. 68.

On examination by Anderson's attorney, Kutschbach opined that the laundry worker job would not require the person to be around three or more people.  He opined that the job was performed in groups of two.  R. 70.[2] Kutschbach also opined that a person would not be employable if the person had to take a break of thirty minutes to an hour on an unscheduled basis approximately three times a week.   R. 70-71.

---

[2] Part of Kutschbach's testimony was inaudible at this point.  R. 70.  The ALJ's opinion indicates that Kutschbach stated that the person's ability to perform the sorter job would also be unaffected by a limitation that the person not be required to work around three or more people.  R. 44.

## THE DECISION OF THE ALJ

The ALJ issued her decision on January 27, 2011.  R. 30-44.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Disability Analysis).  R. 31-32.  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).

If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of the claimant's age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet, or be medically equivalent to, one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant's impairments, combination of impairments, do not meet or equal a Listing, then the ALJ proceeds to Step 4.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).  The ALJ must determine the claimant's RFC in order to perform this analysis.  If the

claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f).

The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005); Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ also stated if the claimant was disabled, then she must determined whether the disability continued through the date of her decision.  R. 32.  The ALJ stated that she would follow the Commission's eight-step analysis to make this determination (Medical Improvement Analysis).  20 C.F.R. §§ 404.1594  and 416.994.[3]  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1594(f)(1), 416.994(b)(5).  If true, the ALJ must determine at Step  2 whether the claimant has an impairment or combination of impairments at the time of the decision that medically equal a Listing.  If so,

---

[3] The Supplemental Security Income regulations omit the first step in the Medical Improvement Analysis. The other seven steps, however, apply to both types of Disability Benefits.  20 C.F.R. § 416.994(b)(5).

the claimant continues to be disabled and the Medical Improvement Analysis ends.  20 C.F.R. §§ 404.1594(f)(2) and 416.994(b)(5)(i).

If the person's impairments do not equal a Listing at the time of the decision, the ALJ must determine at Step 3 whether medical improvement occurred.  Medical improvement is any decrease in the medical severity of the claimant's impairments.  If medical improvement has occurred, the Medical Improvement Analysis continues to Step 4.  If no medical improvement has occurred, the claimant continues to be disabled and Medical Improvement Analysis skips Step 4 and goes to Step 5.  20 C.F.R. §§ 404.1594(b)(1) & 416.994(b)(1)(i).

At Step 4, the ALJ must determine whether the medical improvement increased the claimant's ability to perform work activities, and specifically whether the claimant's RFC has increased.  If so, the ALJ proceeds to Step 6 of the Medical Improvement Analysis.  If not, the ALJ proceeds to Step 5 of the Medical Improvement Analysis.  20 C.F.R. 404.1594(b)(3) & (f)(4), and 416.994(b)(1)(iii) & (b)(5)(iii).

At Step 5, the ALJ must determine whether an exception to medical improvement applies.  If one set of exceptions apply, the Medical Improvement Analysis continues to Step 6.  If a second set of exceptions apply, the claimant disability ends and the Medical Improvement Analysis

ends.  If no exception applies, the claimant's disability continues and the Medical Improvement Analysis ends.  20 C.F.R. §§ 1594(f)(5), and 416.994(b)(5)(iv).

At Step 6, the ALJ must determine whether the claimant's current impairments or combination of impairments after medical improvement are still severe.  20 C.F.R. §§ 1594(f)(6) and 416.994(b)(5)(v).  If the claimant's current impairments are not severe, the claimant is no longer disabled and the Medical Improvement Analysis ends.  If the claimant's current impairments are severe, the Medical Improvement Analysis continues to Step 7.

At Step 7, the ALJ must determine the claimant's RFC after medical improvement, and then determine whether the claimant could now perform his past relevant work.  20 C.F.R. §§ 404.1594(f)(7) and 416.994(b)(5)(vi).  If so, the claimant is no longer disabled and the Medical Improvement Analysis ends.  If not, the Medical Improvement Analysis continues to Step 8.

At Step 8, the ALJ must determine whether the claimant can perform a significant number of jobs that exist in the national economy considering his age, education, work experience, and current RFC after medical improvement.  20 C.F.R. §§ 404.1594(f)(8) and 416.994(b)(5)(vii).  If so,

then the claimant's disability ends.  If not, the claimant's disability
continues.

The ALJ found that Anderson met his burden at Steps 1 and 2 of the
Disability Analysis.  The ALJ found that Anderson had not engaged in
substantial gainful activity since June 1, 2006, the alleged onset date.  The
ALJ also found that Anderson suffered from severe impairments of major
depressive disorder, panic disorder, generalized anxiety disorder, and
history of polysubstance abuse, in remission.  The ALJ found that
Anderson suffered from these severe impairments at all times relevant to
the decision.  R. 34.

At Step 3 of the Disability Analysis, the ALJ found that Anderson's
impairments or combination of impairments did not meet or equal a Listing.
R. 34.  The ALJ considered Listing 12.04 for affective disorders such as
depression and Listing 12.06 for anxiety related disorders.  R. 34-35.

At Step 4 of the Disability Analysis, the ALJ determined that from
June 1, 2006, to November 25, 2008, Anderson had the RFC to perform
light work except that he would need to take unscheduled breaks of up to
an hour a few times a week.  R. 35.  The ALJ relied on the treatment notes
and diagnoses from Stumpf, Edwards, and Dr. Sanchez to support this
finding.  The ALJ found that Anderson's panic attacks would require the

unscheduled breaks on a weekly basis.  R. 35-36.  Based on this RFC, the ALJ found that Anderson could not perform his past relevant work during this time period.  The ALJ relied on vocation expert Kutschbach's opinions to support this finding.  R. 36-37.

At Step 5 of the Disability Analysis, the ALJ determined that June 1, 2006, to November 25, 2008, Anderson could not perform any other jobs that existed in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the opinions of vocational expert Kutschbach.  R. 37-38.

The ALJ then began the Medical Improvement Analysis.  The ALJ had previously determined the issue at Step 1, that Anderson was not engaged in substantial gainful activity since June 1, 2006.  R. 34.  The ALJ found at Step 2 of the Medical Improvement Analysis that Anderson's impairments did not meet a Listing on or after November 26, 2008.  The ALJ relied on the initial finding under the Disability Analysis that his impairments did not meet a Listing.  R. 38.

At Step 3 of the Medical Improvement Analysis, the ALJ found that medical improvement occurred as of November 26, 2008.   The ALJ relied on Edwards' November 25, 2008, assessment that as a result of his

treatment at Transitions and his medications, Anderson's panic attacks were controlled and his depression had improved.  R. 38.

The ALJ found at Step 4 of the Medical Improvement Analysis that the medical improvement related to work activities.  R. 43.  The ALJ determined that after medical improvement, Anderson had the RFC to perform light work that was limited to one and two-step assemblies. Anderson's RFC was further limited because Anderson was only able to relate minimally but adequately to coworkers and supervisors and because he could only withstand the stress of moderately stressful work.  R. 38. The ALJ relied on the treatment and assessment records from Transitions that indicated that the panic attacks were under control after the Edwards November 25, 2008, assessment, and that Anderson's main problems seem to be motivational.  The ALJ also relied heavily on the opinions of Drs. Froman and Henson.  R. 41.

The ALJ found that Anderson's testimony about the severity of his symptoms was not credible.  The ALJ found that the testimony was inconsistent with the treatment notes from Transitions which generally showed that the medication was effective, that his panic attacks were under control, that he was sleeping well, that Anderson was setting goals of going back to school and working;  that, with one exception on March 19, 2009,

Anderson denied having any suicidal or homicidal ideations; and that after

November 25, 2008, Anderson did not report  any psychosis such as

auditory hallucinations.  R. 38-43.

The ALJ skipped Step 5 of the Medical Improvement Analysis

because she found that medical improvement occurred and the

improvement related to work activities.  The ALJ had also already made the

relevant finding for Step 6 of the Medical Improvement Analysis when she

found that at all times Anderson continued to suffer from major depressive

disorder, panic disorder, generalized anxiety disorder, and history of

polysubstance abuse, in remission.  R. 34.

At Step 7 of the Medical Improvement Analysis, the ALJ found that

beginning on November 26, 2008, Anderson could not return to his past

relevant work even with the medical improvement.  The ALJ relied on her

RFC determination after medical improvement and the opinion of

vocational expert Kutschbach.  R. 43.

At Step 8 of the Medical Improvement Analysis, the ALJ found that

beginning on November 26, 2008, Anderson could perform a significant

number of jobs that exist in the national economy.  The ALJ relied on the

finding of the RFC after medical improvement and Kutschbach's opinions

that such a person could perform the laundry worker, repack room worker,

and sorter jobs.  R. 43-44.  The ALJ further relied on Kutschbach's opinion

that the laundry worker and sorter jobs were performed in groups of one or

two people as further support that Anderson could perform these jobs.

R. 44.

Anderson appealed the decision of the ALJ.  On April 24, 2012, the

Appeals Council denied Anderson's request for review.  The ALJ's decision

then became the decision of the Commissioner.  R. 1.  Anderson then filed

this action for judicial review.

ANALYSIS

This Court reviews the Decision of the Commissioner to determine

whether it is supported by substantial evidence.  In making this review, the

Court considers the evidence that was before the ALJ.  Wolfe v. Shalala,

997 F.2d 321, 322 n.3 (7th Cir. 1993).  Substantial evidence is "such

relevant evidence as a reasonable mind might accept as adequate" to

support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).

This Court must accept the findings if they are supported by substantial

evidence, and may not substitute its judgment.  Delgado v. Bowen, 782

F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility

determinations of the ALJ unless the determinations lack any explanation

or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir.

2008).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision is supported by substantial evidence.  Anderson does not challenge the ALJ's Disability Analysis, so the Court will not address that analysis directly.  The ALJ's Medical Improvement Analysis is supported by substantial evidence.  Anderson was not engaged in substantial gainful activity, he suffered from panic disorder, generalized anxiety disorder, depression, and polysubstance abuse in remission.  None of his impairments equaled a Listing.  These findings are undisputed.

Substantial evidence supports the ALJ's finding that medical improvement occurred by November 26, 2008.  The Edwards November 25, 2008, assessment states that Anderson's panic attacks were under control and his depression had improved.  Subsequent treatment notes from Transitions indicate that Anderson's sleep had improved and his medications were generally effective.  The notes from Transitions show no suicidal or homicidal ideations except on one occasion, March 19, 2009. The notes from Transitions show no hallucinations after November 25, 2008.  This evidence provides substantial support for the finding.

The ALJ further found at Step 4 of the Medical Improvement Analysis that the medical improvement related to work activities and increased his RFC.  The increased RFC finding is supported by the opinions of Drs. Froman and Henson, as well as Anderson's April 17, 2009, Function Report in which Anderson stated that he could maintain concentration for an hour at a time, follow both written and spoken instructions, and relate to authority figures as long as they were not "jerks."  R. 164.  At Step 6, the ALJ found that Anderson continued to suffer from his severe impairments. The ALJ stated that he suffered from those impairments at all times relevant to the decision.  R. 34.

The ALJ's RFC finding at Step 7 that Anderson could not return to his past relevant work even after his medical improvement is supported by the opinions of Drs. Froman and Henson and the increased RFC after medical improvement.

The ALJ's finding at Step 8 of the Medical Improvement Analysis is supported by the opinions of vocational expert Kutschbach that a person of Anderson's age and with his education, experience, and increased RFC could perform jobs that exist in significant numbers in the national economy.  The decision, thus, is supported by substantial evidence.

Anderson argues that the ALJ erred by failing to properly apply the

Medical Improvement Analysis.  The Court respectfully disagrees.  The ALJ

also did not repeat Steps 1 and 6 because she already made those findings

in the Disability Analysis and indicated that those findings continued

throughout the entire period.  R. 34.  The Court can track the ALJ's use of

the Medical Improvement Analysis and the reasoning and determinations

that she reached.

Anderson argues that the ALJ failed to determine whether medical

improvement occurred.  Again, the Court respectfully disagrees.  The ALJ

found that Edwards' November 25, 2008 report showed that medical

improvement occurred.  The November 25, 2008, report clearly stated that

Anderson "has been able to gain greater control" of his panic and anxiety

disorder.  R. 274.  The improvement with his anxiety and panic disorders

made Anderson more aware of his depression.  Edwards also stated,

however, that "[Anderson] had made considerable progress reducing

symptoms of depression over the past year."  R. 264.  The statements by

Edwards in the report support the ALJ's findings of medical improvement.

The opinions of Drs. Froman and Henson also support this finding.

Anderson argues that the ALJ improperly relied on evidence that

Anderson could perform daily activities such as caring for himself and

household chores.  Anderson properly notes that the ALJ generally cannot rely solely on a claimant's ability to perform daily activities to contradict a claim of disability.  See e.g., Zuwarski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001).  The ALJ did not rely solely on Anderson's ability to perform daily activities.  The ALJ relied on the reports of healthcare professionals such as counselor Edwards, and the opinions of consultative experts such as Drs. Froman and Henson.  The Court sees no error on this point.

Anderson next argues that the record does not support the showing of medical improvement.  The Court again respectfully disagrees.  As explained above Edwards' November 25, 2008, assessment shows medical improvement in Anderson's panic disorder, anxiety disorder, and depressive disorder.  The subsequent notes from Transitions show that Anderson's medication was generally effective.  Anderson did not again report any hallucinations after November 25, 2008, and did not report any thoughts of suicide or homicide, except for one report of fleeting suicidal thoughts to a nurse in March 2009.  He also generally reported that his sleep was good at most of his appointments at Transitions.  This information provides substantial evidence to support the ALJ's findings.

The records also contain substantial evidence to support the finding of medical improvement related to work activities.  The opinions of Drs.

Froman and Henson provide substantial evidence for this.  Dr. Froman was clearly skeptical of Anderson's ability to restart his life, but that skepticism related to the episodic treatment Anderson had received in the past. Dr. Froman still opined that Anderson had the ability to work at the level found by the ALJ in the RFC determination.  These opinions provide substantial evidence for the finding.[4]

Anderson next argues that the ALJ's credibility finding was not supported by substantial evidence.  Anderson argues that the ALJ only recited boiler plate language.  The Court strongly disagrees.  The ALJ recited language from the Commission's rulings and regulations regarding its findings.  See R. 38-39; cf. SSR 96-7p.   The ALJ then explained the basis for those findings.  The ALJ found that Anderson was not credible because his testimony was inconsistent with his medical records and not consistent with the opinions of Dr. Froman and Henson.  Anderson's testimony about his symptoms was inconsistent with the other evidence in the record.  For example, Anderson testified that his depression had not improved at all since he started treatment at Transitions in 2006.  R. 60. This directly contradicts Edwards' November 25, 2008, assessment.  See

---

[4] Anderson attempted to support his argument, in part, with evidence of medical treatment that occurred after the ALJ issued her decision.  See Anderson Motion, at 9-10.  Anderson does not seek a remand under sentence six of 42 U.S.C. § 405(g).  The evidence of treatment after the issuance of the decision is therefore irrelevant.  Eads v. Secretary of Dept. of Health and Human Services, 983 F.2d 815, 817-18 (7th Cir. 1993).  The Court cannot and has not considered this evidence.

R. 262.  Anderson testified that he had thoughts of suicide three to four times a week.  R. 61-62.  The medical records from Transitions show that he reported no thoughts of suicide after November 25, 2008, except for one reference on March 19, 2009, to fleeting thoughts of suicide.  See e.g., 340, 341-42, 345, 380.  Anderson testified that he had trouble sleeping.  R. 61.  The medical records from Transitions generally showed that he reported sleeping well.  See R. 340, 345, 373.   Anderson testified that he had difficulty concentrating.  R. 58.  Anderson stated in the April 2009 Function Report that he could concentrate on one thing for an hour at a time.  See R. 164.  These inconsistencies in the record support the ALJ's credibility finding.  The Court will not disturb the credibility finding.

WHEREFORE Defendant Acting Commissioner of Social Security's Motion for Summary Affirmance (d/e11) is ALLOWED and Plaintiff's Brief in Support of Motion for Summary Judgment (d/e 10) is DENIED.  The decision of the Acting Commissioner is AFFIRMED.  All pending motions are denied as moot.  THIS CASE IS CLOSED.

ENTER:   April 24, 2013

_____*s/ Byron G. Cudmore*_____
UNITED STATES MAGISTRATE JUDGE